ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

SAILAJA M. PAIDIPATY (NYBN 5160007)
CHRIS KALTSAS (NYBN 5460902)
Assistant United States Attorneys

> 450 Golden Gate Avenue, Box 36055
> San Francisco, California 94102-3495
> Telephone: (415) 436-7200
> FAX: (415) 436-7234
> sailaja.paidipaty@usdoj.gov
> chris.kaltsas2@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>  v.<br><br>RICHARD SZE,<br><br>       Defendant. | **CASE NO. 23-0118 BLF**<br><br>**UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE**<br><br>Date:  July 30, 2024<br>Time:  9:00 a.m.<br><br>Hon. Beth L. Freeman |

## I.    INTRODUCTION

Nearly three years after his arrest, Defendant Richard Sze comes before this Court for sentencing.  For almost a decade, Sze conspired with his co-defendants to defraud his employer, pocketing over a million dollars from 2016 to 2019 alone.  As information in the Presentence Report details, Sze did not need this money out of desperation.  Rather, as fraud often is, this was a crime of greed.

Sze was not the mastermind of the scheme.  That was co-defendant Kevin Chao.  And it was not Sze's business contacts that created the infrastructure for the fraud.  That was co-defendant

Suryanarayana Murthy Bobba.  Rather, Sze was the boots on the ground overseeing the outsourced engineers and carrying out Chao's instructions, for which he was paid handsomely.  His facilitation was key to the scheme's ability to endure for so long.

In contrast to his time at Company-1, from the time of his arrest, Sze came forward revealing conduct extending well beyond what law enforcement initially believed was the scope of the fraud.  Sze's extensive cooperation, as described in more detail below, merits a meaningful downward departure.  The government moves for a four-level departure under U.S. Sentencing Guidelines § 5K1.1, reducing the advisory sentencing guidelines range by fifty percent.  From there, in assessing the statutory sentencing factors, including the nature and circumstances of the defendant, who has no criminal record, his low risk for recidivism, and his prepayment of restitution, the government recommends a further downward variance to a sentence of three years' probation.

## II.      PROCEDURAL POSTURE

Sze was charged by criminal Complaint in October 2021.  Presentencing Report ("PSR") ¶ 4.  As detailed below, he began cooperating with the government, ultimately entering a guilty plea to one count of conspiracy, in violation of 18 U.S.C. § 371, on October 4, 2023.  PSR ¶ 2-3.

## III.     FACTUAL BACKGROUND

The government concurs with the recitation of the offense conduct in the PSR and encourages the Court to adopt it.  Because each co-conspirator played a slightly different role in the scheme, the government briefly outlines Sze's role below.

At a high level, all of Sze's actions involved him secretly playing both sides of a transaction.  Co-conspirator Kevin Chao had broad authority to outsource software development work to vendors.  *See United States v. Kevin Chao*, No. Cr. 23-222 BLF, Dkt. 1, Compl. ¶¶ 41, 44, 84-85.  Capitalizing on the trust that Company-1 put in Chao, the co-conspirators decided to establish their own external software development companies and have Company-1 hire those companies without revealing their ownership interest in those vendors.  Company-1, then, unwittingly paid its own employees on those contracts.

The scheme began in 2010, when the three defendants acquired a corporate shell company called Zillsoft, then owned by one of Bobba's family members.  PSR ¶ 10.  The defendants kept that family

member on public corporate paperwork to mask their involvement. *Id.* Company-1 then hired Zillsoft to perform various services, and the defendants split the profits from these service contracts. PSR ¶ 11. The defendants split the profits with Chao taking the largest cut of 40 percent, and Bobba and Sze receiving 30 percent each. *Id.*

About a year and a half into this operation, the co-conspirators switched their methodology. Because managing an entire external company in addition to their roles at Company-1 was challenging, they sought to sell Zillsoft. Bobba approached an acquaintance, Sagireddy Pulla Reddy, who already owned a software outsourcing firm in India, SP Software Private Limited ("SP Soft India"). PSR ¶ 13. The pitch to Reddy was as follows: if he bought Zillsoft, he would inherit the entity's contracts with Company-1 and the defendants would have Company-1 award additional business to Reddy's companies; in exchange, Reddy would pay an approximately twenty percent kickback to Chao, Sze, and Bobba. *Id.; see also United States v. Reddy,* No CR 23-0489. Dkt. 22, Information ¶ 13-14. Reddy agreed and purchased Zillsoft through a newly incorporated U.S.-based subsidiary of SP Soft India ("SP Soft USA").[1] PSR ¶ 13; *see also United States v. Reddy,* No CR 23-0489. Dkt. 22, Information ¶ 13-14. Chao, Bobba, and Sze split the profits the same way as they did when operating Zillsoft themselves. *See Id*.

A few years later, Chao and Sze expanded the model that they had perfected with SP Soft India. They incorporated an engineering outsourcing entity in China with the plan to have Company-1 contract with this new venture. PSR ¶ 15. Because SP Soft India was already a vetted Company-1 vendor, Chao and Sze entered into an arrangement with Reddy. *Id.* In exchange for Reddy telling Company-1 that the Chinese entity was a new foreign subsidiary of SP Soft, Chao and Sze would pay Reddy three percent of the gross receipts billed to Company-1 from the Chinese firm. PSR ¶ 17.

As Sze continued overseeing the various engineering projects worked on by SP Soft India and SP Soft China, Chao and Bobba continued finding other ways to profit off of Company-1. In 2017,

---

[1] At the time that this case was initially charged, Reddy's entities were anonymized as "Company-2" because it was unclear whether employees of SP Soft India or SP Soft USA were involved in the fraud. Since then, the government has charged Reddy, who has entered a guilty plea and is pending sentencing. The PSR in this case, mirroring the Information and Plea Agreement, refers to Reddy's company as "Company-2." Because the identity of Company-2 is now public, the government refers to SP Soft India / SP Soft USA by name herein.

Chao and Bobba helped broker a sale of a software program to Company-1 through an outside company familiar to Bobba. PSR ¶ 18. As part of the negotiations, Chao caused Company-1 to buy the software at an inflated price. *Id.* Both Bobba and Chao pocketed over $1 million each based on the transaction. PSR ¶ 19. Though Sze did not actively participate in this transaction, Chao gave $220,000 to Sze from the illicit profits of the deal. *Id.*

## IV.   U.S. SENTENCING GUIDELINES

The parties and the U.S. Probation Office ("Probation") agree that the applicable Guidelines are as follows:

|  | U.S.S.G. Section | Level/Points |
|---|---|---|
| Base Offense Level | • 2B1.1(a)(2) | +6 |
| Enhancements<br>• Loss between $550,000 and $1.5M | • 2B1.1(b)(1)(H) | +14 |
| • Sophisticated means / portion of offense occurred abroad | • 2B1.1(b)(10)(B-C) | +2 |
| Reductions<br>• Zero-point Offender | • 4C1.1 | -2 |
| Acceptance of Responsibility | • 3E1.1 | -3 |
| | Total Offense Level | 17 |
| | Advisory GL Range - CHC I | 24-30 months |

### A.   Loss Amount Under U.S.S.G. § 2B1.1

The parties agree that the applicable loss that can be proven by a preponderance of the evidence falls between $550,000 and $1.5 million. This amount consists of the amount of money paid to Reddy as part of the kickback for the SP Soft China scheme as well as Sze's proceeds from the software acquisition in 2017. In both of those cases, Company-1 paid amounts in excess of what they would have paid in an arms-length transaction negotiated in good faith and received no incremental value in return.

As the PSR notes, Sze maintains that Company-1 faced no further loss, arguing that he believed the Company believed received fair value for the services rendered by the outsourcing firms. *See* PSR ¶ 8, n.1. The government takes no position on this argument and as noted in prior related sentencings, its position with respect to fraud "loss" here is limited to the particular requirements for determining loss under U.S.S.G § 2B1.1(b)(1). The government takes no position on potential overall "loss" faced by

1  Company-1 as defined in other areas of the law or any claims for further redress that Company-1 may
2  bring.

3  **B.     Motion for Downward Departure under 5K1.1**

4  The government agrees with Probation's calculation of the Guidelines above.  In addition to the
5  base offense level, enhancements, and reductions reflected in the PSR, the government moves the Court
6  to apply a four-level downward departure under U.S.S.G. § 5K1.1 in recognition of Sze's substantial
7  assistance of the government in the investigation and prosecution of these crimes against Company-1.

8  Almost immediately after being arrested, Sze began cooperating.  His early proffers significantly
9  expanded the government's knowledge of the conduct and contextualized the portion of the fraud that
10  was charged initially in the criminal Complaint.  The Complaint charged only the conduct described
11  above regarding SP Soft China.  What investigators were unaware of at the time was the full scope of
12  the conspiracy.  With his first proffer, Sze changed the trajectory of the case by revealing the multiple
13  schemes in which he, Chao, and Bobba were involved.

14  Sze's information, which led to the expanded investigation, also led to charges against Reddy
15  and increased restitution for Company-1.  While co-conspirator Bobba was also working with the
16  government, he was not involved in the SP Soft China scheme, which was the core conduct to which
17  Reddy pled guilty.  Sze's anticipated testimony and emails that he produced corroborating his statements
18  were therefore crucial to establishing the case against Reddy.

19  Similarly, the government believes that Sze's prompt cooperation led to the agreed-upon
20  resolution with Chao, who could no longer deny his central role in the operation, and the over $3 million
21  restitution payment that was part of the agreement.

22  In comparing the relative cooperation of Sze and Bobba, the government notes that Bobba came
23  forward prior to being charged, albeit after Chao and Sze were charged.  Primarily for that reason, the
24  government moved for a five-point downward departure for Bobba in comparison to the four-point
25  departure here.   This does not diminish Sze's assistance and the departure recommended by the
26  government reduces the applicable Guidelines range by fifty percent, a significant recognition of Sze's
27  cooperation if adopted by the Court.

28  //

**V.     ARGUMENT**

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2).  *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).  The Court should begin by calculating the correct sentencing range under the Sentencing Guidelines.  *Id.*  The Guidelines are "the 'starting point and the initial benchmark,'" *United States v. Ellis*, 641 F.3d 411, 415 (9th Cir. 2011) (quoting *United States v. Kimbrough*, 552 U.S. 85, 108 (2007)), and the Court should "remain cognizant of them throughout the sentencing process." *United States v. Gall*, 552 U.S. 38, 50 n.6 (2007).  After determining the appropriate Guidelines calculations, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a).  *Carty*, 520 F.3d at 991-93.  Here, considering the history and characteristics of the defendant and the need to afford adequate deterrence, a probationary sentence is sufficient to vindicate the statutory sentencing factors.  18 U.S.C. § 3553(a)(1), (a)(2)(B).

The difficulty in determining an appropriate sentence here lies in the tension between Sze's commission of an extensive and years-long multifaceted fraud scheme and the efforts he has taken since to do the right thing.  Evaluating the nature and circumstances of the offense on its own weighs towards a custodial sentence.  18 U.S.C. § 3553(a)(1).  Unlike other defendants before this Court, Sze lived a relatively comfortable and law-abiding life.  His choice to commit the crime, therefore, was just that – a choice.  At the same time, the government recognizes that Sze may have felt indebted to Chao, his first employer, and intimidated by him.  The government's recommendation also accounts for Sze's role in the conspiracy.  He was not the leader of the scheme and profited significantly less than Chao.  But his participation spanned nearly a decade; meaning for nine years, Sze made active decisions to deceive.

When coupled with the remaining 3553(a) factors, however, a custodial sentence is not necessary to meet the statutory goals of sentencing.  Sze has never before run afoul of the law and appears to be a low risk with respect to recidivism.  Though that is true in nearly all white-collar defendants, it remains a factor that the government and the Court must consider.

In addition to admitting to his conduct and cooperating, Sze took another significant step towards redressing the harm he caused by prepaying $900,000 in restitution and agreeing to over $39,000 in forfeiture.  As noted during prior sentencings, receiving restitution pre-sentencing was important to

1    Company-1 and the government credits Sze's efforts to accomplish this.

2        Finally, a probationary term avoids unwanted sentencing disparities when comparing the relative

3    conduct and sentences imposed upon co-conspirators Bobba and Reddy (also non-custodial sentences

4    that the government supported).

5        Weighing the competing factors together and being mindful of the Court's mandate to impose a

6    sufficient but not greater than necessary sentence, the government submits that a probationary term

7    appropriately balances the individual circumstances of this case and vindicates the goals of sentencing.

8    **VI.**     **CONCLUSION**

9        The government respectfully urges the Court to impose a sentence of three years' supervised

10    release, restitution in the amount of $900,000, with credit for fully payment, and a mandatory $100

11    special assessment.

12    DATED:  July 23, 2024                  Respectfully submitted,

13                                        ISMAIL J. RAMSEY
United States Attorney

14

15                                         _____/s/_____

16                                         SAILAJA M. PAIDIPATY
CHRIS KALTSAS

17                                         Assistant United States Attorneys

18

19

20

21

22

23

24

25

26

27

28